**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| REYNALDO GULIN, JR., <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | Civil Action No. 13-01897 (JLL) <br><br><br> **OPINION** |

**LINARES**, District Judge.

Before the Court is Plaintiff Reynaldo Gulin, Jr. ("Plaintiff")'s appeal, seeking review of a final determination by Administrative Law Judge ("ALJ") Donna Krappa denying his application for a period of disability and disability insurance benefits ("DIB"). The Court resolves this matter on the parties' briefs pursuant to Local Civil Rule 9.1(f). For the reasons set forth below, the Court **AFFIRMS** the final decision of the Commissioner of Social Security.

## I.     BACKGROUND

Plaintiff maintains that he was disabled within the meaning of the Social Security Act from February 21, 2008, through December 31, 2012, the date of the ALJ's decision. (*See* Pl.'s Br. 1-2, ECF No. 17). Plaintiff was born on November 11, 1962, and was forty-five years old when he applied for benefits in October 2008. (R. at 143).[1] He is married, has three children, and lives in an apartment with his family. (*Id.* at 49, 66). He is a high school graduate, served for four years in the United States Marine Corps and one year in the United States Army

---

[1] "R." refers to the pages of the Administrative Record.

Reserve, and worked for twenty-three years with the New Jersey Department of Transportation ("NJDOT"). (*Id.* at 49-51). He most recently worked as an Assistant Crew Supervisor, supervising a highway maintenance team for the NJDOT. (*Id.* at 52). He took a medical retirement from that job. (*Id.* at 51).

With regard to his activities of daily living, Plaintiff testified at the hearing that he showers, shaves, cooks, cleans, launders, watches television, and socializes with his family. (*See id.* at 50, 62, 66-67). He also testified that he sometimes has no desire to leave his apartment even when it is warm outside. (*Id.* at 50).

A.    Plaintiff's Impairments

Plaintiff maintains that he is disabled due to the limitations resulting from his: (1) cardiac disorder (post stent implant); (2) back disorder; (3) knee disorder; and (4) depression. A discussion of each of these impairments follows.

1.    Plaintiff's Heart Disorder (Post Stent Implant)

Plaintiff suffers from a heart disorder, from which serious complications arose on February 21, 2008. (*Id.* at 53-54, 239). On that date, he reported to the Bayonne Medical Center emergency room with chest pain and numbness in his left arm. (*See id.* at 239). The following day, Dr. Peter Wong operated on Plaintiff's heart to treat his unstable angina. (*Id.* at 252-53) Specifically, Dr. Wong performed a cardiac catheterization, thereby placing a stent in the left anterior descending artery of his heart. (*Id.* at 448-49). Post-surgery, Dr. Wong described the stent placement as "successful." (*Id.* at 449).

Plaintiff returned to the Bayonne Medical Center emergency room five days later, on February 27, 2008, with acute chest pain. (*Id.* at 255-57). Dr. Wong again performed a cardiac catheterization, from which he concluded that Plaintiff had normal left ventricular systolic

2

function and single vessel disease involving the left anterior descending artery of his heart. (*Id.* at 269-70). The discharge summary from the following day notes that Plaintiff "eventually did well with his labs, [electrocardiograms ("EKGs")], and chest x-ray . . . ." (*Id.* at 257). That summary further notes that the "[b]ottom line is, he did improve . . . ." (*Id.*).

Plaintiff again returned to the Bayonne Medical Center emergency room on March 21, 2008, after experiencing an approximately twenty minute episode of chest pain. (*Id.* at 272). The admission note states that Plaintiff was given nitroglycerin tablets, which relieved his symptoms. (*Id.*). The tests administered to Plaintiff at that time generally produced normal results. (*See id.*). Dr. Wong subsequently performed another cardiac catheterization on Plaintiff's heart on March 24, 2008, again concluding that Plaintiff had normal left ventricular systolic function and single vessel disease involving the left anterior descending artery of his heart. (*Id.* at 289-90). The medical center discharged Plaintiff on the following day. (*Id.* at 274). The discharge summary, prepared by Doctor of Osteopathic Medicine Howard Levine, notes that the bottom line of the battery of tests performed on Plaintiff is that "he did well" and could thus go home. (*Id.*).

Plaintiff returned to the Bayonne Medical Center emergency room one final time on May 8, 2008, with chest pain. (*Id.* at 292-93). The hospital discharged Plaintiff on the following day. (*Id.* at 294). Dr. Levine's discharge summary diagnosed him with chest pain, atherosclerosis of the native vessel, and pure hypercholesterolemia. (*Id.*).

On July 7, 2008, Plaintiff reported to the Saint Barnabas Medical Center emergency room in Livingston, New Jersey. (*Id.* at 312). He was experiencing chest pain at the time of admission, and was kept under observation for twenty-four hours. (*Id.* at 312-13). The

discharge summary notes that Plaintiff's final diagnosis was angina pectoris, coronary artery disease, and hypercholesterolemia. (*Id.* at 313-14).

The record includes treatment notes from Plaintiff's treating physician, Dr. Steven M. Levine. (*Id.* at 493-506). The September 2008 treatment note states that Plaintiff then had left abdominal pain, shortness of breath when running, and angina. (*Id.* at 497). In January 2009, Dr. Levine completed a Cardiac Residual Functional Capacity ("RFC") form. (*Id.* at 473-87). He noted therein that Plaintiff has coronary artery disease, characterized by chest pain and shortness of breath. (*Id.* at 473). Dr. Levine also noted that Plaintiff's heart condition causes him to suffer from emotional difficulties, frequently interferes with his attention and concentration even when performing simple tasks, and makes him incapable of performing "low stress" jobs. (*Id.* at 474). Dr. Levine's February 2009 treatment note states that Plaintiff had no complaints at that time. (*Id.* at 494).

In July 2009, state consultant Dr. Alexander Hoffman examined Plaintiff. (*Id.* at 534-36). Dr. Hoffman noted that Plaintiff's heart had a regular rate and rhythm, and a "borderline normal EKG." (*Id.* at 534-36). Dr. Hoffman additionally noted that Plaintiff then took medication for hypertension and elevated lipid levels. (*Id.* at 536).

A myocardial perfusion scan and EKG were performed on Plaintiff in April 2010. (*Id.* at 591-92). Both tests produced results within "normal" limits. (*Id.*). At the hearing before the ALJ in December 2010, Plaintiff testified that he could lift about fifteen pounds before he begins to have chest pains, and that he cannot bend down to pick up objects. (*Id.* at 57).

### 2.    Plaintiff's Back Impairment

Plaintiff has degenerative disc disease, which causes him to have back pain. (*Id.* at 570). An MRI performed on Plaintiff's lumbar spine in December 2009 revealed that Plaintiff had

4

anterior and posterior bulges of the L3-L4 and L4-L5 intervertebral discs. (*Id.*). The MRI also

revealed that Plaintiff has mild stenosis of the bilateral L4-L5 Neural Foramina. (*Id.*). At the

hearing before the ALJ in December 2010, Plaintiff testified that his back starts to hurt him if he

sits in a chair for extended periods of time. (*Id.* at 55). He also testified that he has undergone

physical therapy to deal with his back pain, but that he has never required medication, injections,

or surgery to treat his back pain. (*Id.* at 63-64).

       3.   <u>Plaintiff's Knee Impairment</u>

Plaintiff suffers from a right knee impairment. (*See id.* at 55-57). In May 2009, Dr.

Steven Levine diagnosed Plaintiff right knee pain, noting that he was positive for crepitus. (*Id.*

at 608). Dr. Levine referred Plaintiff to Dr. Robin B. Innella, a doctor of osteopathic medicine at

Associated Orthopedics in Bayonne, New Jersey. (*See id.* at 600). Dr. Innella examined

Plaintiff's right knee later that month. (*Id.*). He noted that Plaintiff had undergone four

arthroscopic knee surgeries, the most recent one being twelve years prior. (*Id.*). He also noted

that Plaintiff's right knee was positive for crepitus with flexion and extension, and that x-rays of

that knee showed some patellofemoral sclerosis but were otherwise unremarkable. (*Id.*). Dr.

Innella diagnosed Plaintiff with chondromalacia patella with recurrent synovitis. (*Id.*). To treat

Plaintiff's right knee pain, Dr. Innella scheduled Plaintiff for a course of Euflexxa injections, and

prescribed him Naprosyn. (*Id.*).

In December 2009, an MRI was performed on Plaintiff's right knee. (*Id.* at 595). The

MRI revealed an abnormal signal in the posterior horn of the medial meniscus consistent with

degeneration, a horizontal tear in the body of the lateral meniscus, and a small knee joint

effusion. (*Id.*).

In February 2010, Dr. Levine noted that Plaintiff was experiencing pain on both the lateral and medial sides of his right knee, as well as behind the kneecap, which Plaintiff described as a nine out of ten. (*Id.*). Dr. Levine also noted that Plaintiff's pain worsened when walking, and kept him up at night. (*Id.*). Dr. Levine's examination revealed that Plaintiff's right knee was tender and had two torn ligaments, but that it had no atrophy or weakness, no decreased range of motion, no decreased strength, and no swelling in the joint. (*Id.*). He prescribed Plaintiff Vicodin. (*Id.*).

In September 2010, Dr. Levine noted that Plaintiff was in constant pain, and that his right knee would cramp up while lying down. (*Id.* at 603). Dr. Levine also noted that Plaintiff's right leg shook at night, and that Plaintiff described the pain he was experiencing while walking as a ten out of ten. (*Id.*) Dr. Levine ultimately diagnosed Plaintiff with restless leg syndrome. (*Id.*).

At the hearing before the ALJ in December 2010, Plaintiff testified that his knee stiffens up and then begins to hurt "really bad" after a "while of sitting." (*Id.* at 55). To deal with this issue, Plaintiff testified that he has to get up and move his knee. (*Id.*). He also testified that he can walk for one and a half blocks before his knee starts "giving out," and that he can stand for about ten to fifteen minutes if he does not place a significant amount of weight on his right leg. (*Id.*).

Plaintiff suffers from depression. (*See id.* at 509). He has met with a psychiatrist, Dr. Charles Carluccio, on a bi-weekly basis since February 2007. (*Id.*). In September 2008, Dr. Steven Levine noted that Plaintiff was depressed due to his financial situation. (*Id.* at 497). Subsequently, in June 2009, Dr. Carluccio completed a Mental Impairment Questionnaire. (*Id.* at 509-11). He assigned Plaintiff a Global Assessment Functioning ("GAF") rating of forty at

that time,[2] which was also Plaintiff's highest GAF rating throughout the past year. (*Id.* at 509).

Dr. Carluccio noted that Plaintiff had been treated with supportive psychotherapy and

psychotropic medications, specifically, Lexapro and Lunesta, and that Plaintiff's response had

been "fair." (*Id.*).  Ultimately, Dr. Carluccio's prognosis of Plaintiff was guarded to poor. (*Id.*).

In August 2009, Dr. Gerard A. Figurelli performed a psychiatric consultative examination

of Plaintiff. (*Id.* at 543-46).  According to Dr. Figurelli, Plaintiff reported that he had struggled

with depression since childhood, and that his depression was "manageable" while on

psychotropic medications. (*Id.* at 543).  Plaintiff also reported a history of suicidal ideation,

intent, and plan but no actual attempt. (*Id.*).  Additionally, he reported that he had experienced

anxiety attacks since he was about sixteen years old. (*Id.*). In his mental status evaluation, Dr.

Figurelli noted, among other things, that Plaintiff's judgment was adequate, and that he

manifested no deficits with immediate recall, with delayed recall, or with concentration on

structured tasks of relatively short duration. (*Id.* at 544).   Dr. Figurelli diagnosed Plaintiff with

major depressive disorder in partial remission, and assigned him a GAF rating of sixty.[3] (*Id.* at

546).

In August 2009, Benito Tan, a non-examining state agency consultant, completed a

Mental RFC Assessment questionnaire concerning Plaintiff. (*Id.* at 561-63).   Tan noted therein

that Plaintiff has moderate limitations with the following abilities: (1) carrying out detailed

---

[2] The GAF Scale ranges from zero to one-hundred.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (hereinafter "DSM-IV-TR").  An individual's "GAF rating is within a particular decile if *either* the symptom severity or the level of functioning falls within the range." *Id.* at 32. "[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two." *Id.* at 33.  "In most instances, ratings on the GAF Scale should be for the current period (*i.e.*, the level of functioning at the time of the evaluation) because ratings of current functioning will generally reflect the need for treatment or care." *Id.*  A GAF rating of thirty-one through forty indicates "[s]ome impairment in reality testing or communication," or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR 34.
[3] A GAF rating of fifty-one to sixty indicates that an individual has "[m]oderate symptoms," *e.g.*, "flat affect and circumstantial speech, [or] occasional panic attacks," or "moderate difficulty in social, occupational, or school functioning . . . ." DSM-IV-TR 34.

instructions; (2) maintaining attention and concentration for extended periods; (3) working in coordination with, or in proximity to others, without being distracted by them; (4) completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods; (5) accepting instructions and responding appropriately to criticism from supervisors; (6) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) responding appropriately to changes in the work setting. (*Id.* at 561-62). Tan concluded that Plaintiff could follow instructions and that his mental factors did not severely limit his activities of daily living and social functioning. (*Id.* at 563). Tan also concluded that Plaintiff could maintain appropriate social interaction and job adaptation, as well as adequate concentration, persistence, and pace. (*Id.*).

In March 2010, Dr. Michael Cannella completed a Mental Impairment Questionnaire concerning Plaintiff. (*Id.* at 571-76). Dr. Cannella diagnosed Plaintiff with major depressive disorder, and assigned him a current GAF rating of sixty-five and observed that his highest GAF rating throughout the past year had been an eighty-five.[4] (*Id.* at 571). Dr. Cannella described Plaintiff as depressed with a sad mood and tired, and noted that he has occasional suicidal thoughts. (*Id.*). Ultimately, Dr. Cannella gave Plaintiff a "favorable" prognosis. (*Id.*).

At the hearing before the ALJ in December 2010, Plaintiff testified that he began seeing a psychiatrist due to his suicidal thoughts and ideations. (*See id.* at 59-60). He also testified that his medication is helpful and that his financial situation can be a trigger for some of his "bad days." (*See id.* at 60-61). Additionally, Plaintiff testified that he sometimes feels confined and claustrophobic in his apartment and has to take medication to relax. (*Id.* at 61-62).

---

[4] A GAF rating of sixty-one through seventy indicates "some mild symptoms," such as a "depressed mood and mild insomnia," or "some difficulty in social, [or] occupational . . . functioning . . . ." DSM-IV-TR 34. A GAF rating of eighty-one through ninety indicates "absent or minimal symptoms [and] good functioning in all areas . . ." *Id.*

8

B.    Procedural History

Plaintiff initially filed an application with the Social Security Administration for benefits on October 2, 2008. (*Id.* at 141-142). The Administration denied Plaintiff's application and subsequent request for reconsideration. (*Id.* at 85, 93). Plaintiff next requested a hearing before an ALJ, which took place on December 16, 2010 before ALJ Donna Krappa. (*Id.* at 43, 103, 107).

On April 4, 2011, ALJ Krappa issued a decision finding that Plaintiff was not disabled from February 21, 2008 through the date of decision. (*Id.* at 22- 38). Thereafter, on May 2, 2011, Plaintiff sought Appeals Council review of ALJ Krappa's decision. (*Id.* at 18-19). The Appeals Council denied Plaintiff's request on January 25, 2013, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 1). As a result, Plaintiff appealed to this Court on March 25, 2013. (Compl., ECF No. 1). This Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

II.    **LEGAL STANDARD**

A.    The Five-Step Process for Evaluating Whether a Claimant Has a Disability

Under the Social Security Act, the Administration is authorized to pay DIB to "disabled" persons. 42 U.S.C. § 423(a). A person is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1). At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and, thus, the process ends. *Id.* If not, the ALJ proceeds to step two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant is not disabled. *Id.* Conversely, if the claimant has such impairment, the ALJ proceeds to step three. *Id.* At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled. *Id.* Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's [RFC]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process. *Id.*

The claimant bears the burden of proof for steps one through four. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007) (citing *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004)). "At step five, the burden of proof shifts to the Social Security Administration to show

10

that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]." *Id.* (citing *Ramirez*, 372 F.3d at 551).

B.   The Standard of Review: "Substantial Evidence"[5]

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

**III.   DISCUSSION**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period at issue. (R. at 28). At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: (1) a back disorder; (2) a knee disorder; (3) a heart disorder (status post stent implant); and (4) depression. (*Id.*). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically

---

[5] Because the regulations governing supplemental security income—20 C.F.R. § 416.920—are identical to those covering disability insurance benefits—20 C.F.R. § 404.1520—this Court will consider case law developed under both regimes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n. 1 (3d Cir. 2005) (citation omitted).

equaled one of the listed impairments. (*Id.* at 28-29).  At step four, the ALJ determined that Plaintiff had the RFC to perform:

> [T]he *exertional* demands of a combination of a range of sedentary work as defined under the Regulations; specifically, he is able to: lift/carry 20 lbs. occasionally and 10 lbs. frequently; stand/walk 2 hours in an eight hour work day; sit for 6 hours in an eight hour work day—if given the opportunity at the 45-1hr. mark to stand and stretch for 3-5 minutes) [sic]; and perform unlimited pushing and pulling with the weight restriction given.   Regarding the *postural and environmental* demands of work, I find that [Plaintiff] is able to perform jobs:  that require no use of ladders, ropes, or scaffolds; that require only occasional use of ramp or stairs; that require occasional balancing, stooping, kneeling, crouching, and/or crawling; that require no exposure to unprotected heights, hazards or dangerous machinery; that involve no concentrated exposure to temperature extremes, wetness, and/or humidity; that involve no concentrated exposure to undue amounts of dust or known chemical irritants; and that permit ready access to a restroom.  As to the *mental* demands of work, I find that [Plaintiff] is able to perform jobs:  that are unskilled, and repetitive; that permit at least three breaks during the work day—each of at least 15 minutes duration; that are low stress[]; that require no work in close proximity to others (closer than 3-5 feet) to avoid distraction; and that require only occasional contact with supervisors, co-workers, and no contact with the general public.

(*Id.* at 30 (emphasis in the original)).  At step five, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  (*Id.* at 36). Thus, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at 37).  Plaintiff contends that this Court should remand the ALJ's decision because: (1) her step three analysis is deficient; (2) she did not properly assess Plaintiff's credibility at step four; and (3) the hypothetical she posed to the Vocational Expert ("VE") at step five was deficient.  (Pl.'s Br. 11-20).

A.   Whether the ALJ's Analysis at Step Three is Based on Substantial Evidence

Plaintiff argues that the ALJ's step three analysis is deficient because she did not properly assess whether the combination of Plaintiff's severe impairments medically equaled a listed

impairment. (Pl.'s Br. 12). Specifically, Plaintiff argues that the ALJ "failed to consider whether the combination of Plaintiff's impairments medically equaled one of the Listings." (Pl.'s Br. 13). Defendant counters that "the ALJ explicitly evaluated whether plaintiff's impairments medically equaled a listing." (Def.'s Br. 6, ECF No. 20). Defendant further counters that, regardless, "it was plaintiff's burden to establish that his impairments were severe enough to satisfy the criteria of a Listed impairment," and that Plaintiff failed to do so. (*Id.* (citation omitted)). The Court concludes that the ALJ adequately considered whether the combination of Plaintiff's impairments medically equaled a listing, and, thus, affirms the Commissioner's step three finding. The Court now explains its conclusion.

At step three, an ALJ must "fully develop the record and explain [her] findings . . . including an analysis of whether and why [each of the claimant's] impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments." *Burnett*, 220 F.3d at 120. In conducting such an analysis, there is no formal requirement that an ALJ "use particular language or adhere to a particular format . . . ." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). Rather, an ALJ's decision, "read as a whole," must permit meaningful judicial review. *Id.*; *Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146 (3d Cir. 2007) (citations omitted). With regard to an ALJ's duty to consider a claimant's impairments in combination with one another, the Third Circuit has suggested that an ALJ fulfills that duty if she indicates that she has done so, and there is "no reason to not believe h[er]." *Morrison ex. rel. Morrison v. Comm'r of Soc. Sec.*, 268 F. App'x 186, 189 (3d Cir. 2008). Moreover, a number of district courts in this Circuit have concluded that an ALJ fulfills her obligation to consider a Plaintiff's impairments in combination with one another when she states that she has done so and

offers a thorough review of the evidence in the record. *Mason v. Astrue*, No. 09-5553, 2010 WL 3024849 at *6 (D.N.J. Aug. 2, 2010).

Here, the ALJ began her step three analysis with her determination that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments . . . ." (R. at 28). She then noted that in reaching that determination, she paid particular attention to the Listings pertaining to the musculoskeletal system (section 1.00), the cardiovascular system (section 4.00), and mental disorders (section 12.00). (*Id.* at 29); *see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1. The Court now considers whether the ALJ's analysis of each of these listings, when coupled with her discussion of the evidence, permits meaningful judicial review.

       1.     <u>Whether the ALJ's Finding That Plaintiff's Back and Knee Impairments Did Not Meet the Musculoskeletal Listings Permits Meaningful Judicial Review and is Based on Substantial Evidence</u>

With regard to the musculoskeletal system listings (section 1.00), the ALJ concluded at step three that Plaintiff's severe musculoskeletal impairments—his back and knee impairments—were not accompanied by the specific clinical abnormalities or diagnostic test results necessary to meet those listings. (*Id.* at 29). Elsewhere in her decision, the ALJ provided a thorough discussion of the medical evidence concerning Plaintiff's musculoskeletal impairments, which supports her conclusion.

As to Plaintiff's back impairment, the ALJ noted at that step that "there is no evidence of disc herniation or nerve root involvement . . . ." (*Id.*). She later noted that "MRIs taken [of Plaintiff's lumbar spine] in December 2009 showed disc bulges at L3-4, L4-5 and L5-S1 with only mild stenosis and no cord involvement . . . ." (*Id.* at 33). She noted, however, that Plaintiff's disc bulges had not required any invasive forms of treatment—"[he] has had physical

14

therapy, but no injections for pain or surgery." (*Id.* at 31). Thus, "read as whole," the ALJ's decision permits meaningful judicial review and offers substantial evidence that Plaintiff's back impairment did not meet any of the musculoskeletal listings, including the listing for spinal disorders (Listing 1.04).[6] *See, e.g., Jaafar v. Astrue*, No. 09-2903, 2010 WL 3001899 at *6-7 (D.N.J. July 28, 2010) (holding that substantial evidence supported ALJ's conclusion that plaintiff's back condition did not meet the requirements of Listing 1.04 where plaintiff "did not present evidence indicating that either the nerve root or spinal cord were compromised.").

As to Plaintiff's right knee impairment, the ALJ noted that Plaintiff had a meniscus tear with degeneration in that knee. (R. at 33). The ALJ further noted that Plaintiff had complained of knee pain during his visits to Dr. Steven Levine from July 2009 through February 2010, and that Dr. Levine had "noted tenderness of the joint without any decrease in range of motion or in strength and without any swelling . . . ." (*Id.*). As such, the ALJ's decision "read as a whole" permits meaningful judicial review and supports her finding that Plaintiff's knee impairment did not meet any of the musculoskeletal listings, including the listing for the major dysfunction of a joint (Listing 1.02).[7] *See generally Jaafar*, 2010 WL 3001899 at *7 ("Although the ALJ's discussion at Step Three was concise, in combination with the medical findings discussed elsewhere in the opinion it was sufficient to meet the *Burnett* requirement.").

---

[6] To meet the listing for spinal disorders (Listing 1.04), as is relevant here, a claimant must show that his degenerative disc disease results in "compromise of a nerve root . . . or the spinal cord," with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. 20 C.F.R. Pt. 404, Subpt. P, App'x 1.

[7] To meet the listing for the major dysfunction of a joint (Listing 1.02), a claimant must show "gross anatomical deformity" in a joint as well as "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint[], and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint[]." 20 C.F.R. Pt. 404, Subpt. P, App'x 1.

2.   Whether the ALJ's Finding That Plaintiff's Heart Disorder (Post Stent Implant) Did Not Meet the Cardiovascular System Listings Permits Meaningful Judicial Review and is Based on Substantial Evidence

With regard to the cardiovascular system listings (section 4.00), the ALJ concluded at step three that Plaintiff's heart disorder (post stent implant) was not accompanied by the specific clinical abnormalities, impaired myocardial function, or specific clinical abnormalities required by those listings. (R. at 29). She noted that "cardiac testing done after the stent placement showed good heart functioning." (*Id.*). She later referenced the April 2010 myocardial perfusion test and EKG, which were both within normal limits. (*Id.* at 33). Consequently, the ALJ's analysis permits meaningful judicial review, and the ALJ has provided substantial evidence in support of her conclusion.

3.   Whether the ALJ's Finding That Plaintiff's Depression Did Not Meet the Mental Disorder Listings Permits Meaningful Judicial Review and is Based on Substantial Evidence

With regard to the mental disorder listings (section 12.00), the ALJ concluded at step three that Plaintiff's depression was not accompanied by the specific clinical abnormalities or specific clinical abnormalities necessary to meet those listings. (*Id.* at 29). She then provided an exhaustive explanation that permits meaningful judicial review of why Plaintiff's mental impairment did not meet or medically equal the listing for affective disorders (Listing 12.04).[8] (*Id.*). In doing so, the ALJ explained exactly why Plaintiff's depression did not satisfy the paragraph B or C criteria of that listing. The Court briefly recaps the ALJ's explanation concerning the paragraph B criteria.

To satisfy the paragraph B criteria of Listing 12.04, a claimant must demonstrate that his affective disorder results in at least two of the following:

---

[8] A claimant's affective disorder meets or medically equals listing 12.04 when it either satisfies both the paragraph A *and* paragraph B criteria, or satisfies the paragraph C criteria of that listing. 20 C.F.R. Pt. 404, Subpt. P. App'x 1, § 12.04 (emphasis added).

16

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration . . . .

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04. A limitation is "marked" when it is "more than moderate but less than extreme." *Id.* Here, the ALJ determined that Plaintiff's mental impairment did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration. (*Id.*).

As to Plaintiff's activities of daily living, the ALJ found that Plaintiff had only mild restrictions with such activities since he cooks, showers, dresses himself, shaves, watches television, socializes with his family, and drives occasionally. (R. at 29). As to Plaintiff's social functioning, the ALJ found that Plaintiff had only moderate difficulties with such functioning since he did not report any problems with relationships in his small social circle. (*Id.*). The ALJ next found that Plaintiff had moderate difficulties in concentration, persistence and pace because: (1) the evidence from his treating physician showed intact cognitive functioning; (2) he was able to maintain the concentration required to perform his somewhat limited activities of daily living; and (3) he answered all questions asked of him in a timely and appropriate manner at the hearing before the ALJ, demonstrating the ability to concentrate. (*Id.*). Lastly, the ALJ found that a review of the record indicates that Plaintiff had not experienced any episodes of decompensation. (*Id.*). By making the above findings, the ALJ offered substantial evidence in support of her decision that Plaintiff's depression did not meet the listing for affective disorders (Listing 12.04).

### 4. Conclusion

Because the ALJ adequately explained why Plaintiff's impairments did not meet the relevant listings and provided a thorough discussion of the evidence, the Court concludes that the

ALJ's determination that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" is supported by substantial evidence. *See e.g., Mason*, 2010 WL 3024849 at *2 (finding such a determination sufficient where the ALJ provided a thorough review of all the evidence in the record); *see also Jimenez v. Astrue*, No. 07-3556, 2008 WL 5377781 at *10 (D.N.J. Dec. 19, 2008) (finding the same). Moreover, Plaintiff fails to point to any evidence ignored by the ALJ suggesting that his combined impairments would medically equal a listing. *See Cosby*, 231 F. App'x at 146 (finding this shortcoming significant). As such, Plaintiff's reliance on this Court's holding in *Clark v. Astrue* is misplaced since there was competent evidence in that case that the plaintiff's impairments medically equaled Listing 1.04. No. 10-4470, 2011 WL 3444144 at *9 (D.N.J. Aug. 5, 2011).

B.   <u>Whether the ALJ Properly Assessed Plaintiff's Credibility at Step Four</u>

An ALJ must make a finding concerning the credibility of a claimant's statements about his symptoms and their functional effects at step four. S.S.R. 96-7p. In doing so, the ALJ must articulate the reasons for her credibility finding and consider the following evidence in the record:

> (1) The objective medical evidence;
> (2) The claimant's daily activities;
> (3) The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
> (4) Factors that precipitate or aggravate the symptoms;
> (5) The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
> (6) Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
> (7) Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and
> (8) Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

18

S.S.R. 96-7p. Notably, a claimant's "[s]ubjective complaints cannot alone establish disability." *Gantt v. Comm'r of Soc. Sec.*, 205 F. App'x 65, 67 (3d Cir. 2006) (citing 20 C.F.R. § 404.1529(a)).

    Here, the ALJ found that Plaintiff's impairments could reasonably be expected to cause his stated symptoms arising from his knee pain, back pain, and depression, but that those statements were not credible to the extent that they were inconsistent with her RFC finding.[9] (*See* R. at 32). Plaintiff argues that the ALJ's credibility finding is not based on substantial evidence because: (1) she improperly relied on his activities of daily living to discredit him; (2) she improperly relied on a speculative inference—*i.e.*, that he aimed to secure disability benefits to end his financial woes—as a basis to discredit him; and (3) she ignored his exemplary work history in articulating the reasons for her credibility finding. (Pl.'s Br. 13-17). The Court now considers each of Plaintiff's arguments in turn.

        1.    <u>Whether the ALJ Improperly Relied on Plaintiff's Activities of Daily Living in Making Her Credibility Finding</u>

    Plaintiff argues that the ALJ improperly relied on his activities of daily living in discounting his subjective testimony and making her credibility finding. (*See id.* at 13-14). Social Security Ruling 96-7p explicitly states that an ALJ must consider a claimant's "daily activities" when assessing his credibility. Likewise, the Third Circuit has clarified that while "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity … [i]t is nonetheless appropriate for the ALJ to consider the number and type of activities in which the claimant engages." *Turby v. Barnhart*, 54 F. App'x 118,121 n.1 (3d Cir. 2002) (internal quotation marks and citations omitted). As such, in considering

---

[9] The ALJ's RFC is quoted above at the beginning of Part III of this Opinion.

Plaintiff's activities of daily living when assessing his credibility, the ALJ complied with the obligations that the law imposes on her.  In doing so, she did not commit reversible error.

2.     Whether the ALJ Improperly Relied on a Speculative Inference as a Basis to Discredit Plaintiff

Plaintiff next argues that the ALJ improperly relied on a speculative inference as a basis to discredit him.  (*See* Pl.'s Br. 14-16).  Specifically, Plaintiff argues that the ALJ improperly speculated that his financial woes motivated him to exaggerate his symptoms.  (*Id.* at 14).  He also argues that the ALJ improperly speculated that his treating physicians and psychiatrists may have been tempted to overstate the severity of his limitations out of sympathy for his financial circumstances.  (*Id.* at 14-15).

The Court agrees with Plaintiff that the ALJ should not have included such unnecessary speculation in her opinion.  Indeed, "an ALJ may not make speculative conclusions without any supporting evidence [that go] beyond the contradicted evidence in the case . . . ."  *Burnett*, 220 F.3d at 125; *see also Nahory v. Colvin*, No. 12-932, 2013 WL 3943512 at *5 (W. D. Pa. July 30, 2013) (noting that S.S.R. 96-7p does not authorize an ALJ to consider a claimant's motivation to work or incentive not to work).  There is simply no supporting evidence in this case substantiating the ALJ's speculation.  That said, this error does not require remand since the Court is satisfied that the ALJ has otherwise provided sufficient evidence in support of her credibility finding.  *See Nahory*, 2013 WL 3943512 at *5 (affirming the ALJ's decision "notwithstanding the ALJ's isolated comments regarding plaintiff's [financial motives]").

To begin with, as S.S.R. 96-7p requires, the ALJ thoroughly considered of the "objective medical evidence."  (R. at 33-35).  Among other things, the ALJ considered:  (1) the hospital records from the Bayonne Medical Center concerning Plaintiff's heart condition; (2) the treatment notes prepared by his treating physician, Dr. Steven Levine, throughout the relevant

20

time period; (3) the MRIs taken of his lumbar spine and right knee in December 2009; (4) the Mental Impairment Questionnaire and treatment notes prepared by his treating psychologist, Dr. Carluccio; and (5) the available consultative examinations. (*Id.*). In addition, as S.S.R. 96-7p requires, the ALJ considered Plaintiff's daily activities. She noted that Plaintiff showers, shaves, cooks, cleans, launders, watches television, drives a car, and socializes with his family. (*Id.* at 31).

As S.S.R. 96-7p requires, the ALJ also considered the location, duration, frequency, and intensity of the pain produced by each of Plaintiff's impairments. With regard to Plaintiff's heart disorder, the ALJ noted that Plaintiff testified that he thought he could lift up to fifteen pounds before he would experience chest pain. (*Id.* at 31). She ultimately discounted this testimony to the extent that it was inconsistent with her RFC finding that Plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently. In doing so, she noted that Dr. Levine's treatment notes contain few complaints pertaining to that disorder—in April 2008 Plaintiff denied having chest pain and in February 2009 he had no complaints—and that a myocardial perfusion test and EKG administered in April 2010 were within normal limits. (*Id.* at 33). She also noted that "[Plaintiff] has required only medication management since the stent placement." (*Id.* at 35).

With regard to the location, duration, frequency, and intensity of the pain produced by Plaintiff's degenerative disc disease, the ALJ noted that Plaintiff testified that his back starts to hurt him after a while of sitting and that he needs to get up about every forty-five minutes. (*Id.* at 31). The ALJ's RFC finding accounted for this symptom by permitting Plaintiff to stand up after sitting for forty-five minutes to an hour so that he could stand and stretch for three to five minutes. (*Id.* at 30).

With regard to the location, duration, frequency, and intensity of the pain produced by Plaintiff's right knee impairment, the ALJ noted that Plaintiff testified that after a while of sitting his knee stiffens up and that he needs to get up about every forty-five minutes. (*Id.* at 31). She also noted that Plaintiff had testified that he is able to walk about one-and-a-half blocks before his knee gives out, and that he is able to stand for about ten to fifteen minutes at a time. (*Id.*). She discounted this testimony to the extent that it was inconsistent with her RFC finding that Plaintiff could stand or walk for two hours in an eight hour workday, and sit for six hours in an eight hour workday if permitted to stand up every forty-five minutes to an hour in order to stand and stretch for three to five minutes. (*Id.* at 30). In doing so, she noted that although Plaintiff's right knee had a meniscus tear with degeneration and tenderness in the joint, Dr. Levine observed in February 2010 that the knee did not exhibit any decreases in its range of motion or strength, and that the joint did not exhibit any swelling. (*Id.* at 33). She also noted that Plaintiff's activities of daily living were inconsistent with his testimony that he could not stand for more than fifteen minutes or walk for more than one-and-a-half blocks. (*Id.* at 35).

With regard to the duration, frequency, persistence, and intensity of the symptoms stemming from Plaintiff's depression, the ALJ noted that Plaintiff had testified that he experiences some bad days and that he sometimes will not leave his apartment for weeks. (*Id.* at 31). The ALJ discounted this testimony to the extent that it was inconsistent with her RFC finding that Plaintiff is capable of performing low stress, unskilled and repetitive jobs that permit three fifteen minute breaks during the workday, and require: no work in close proximity to others; only occasional contact with supervisors and coworkers; and no contact with the general public. (*Id.* at 30, 31). In doing so, the ALJ discussed the Mental Impairment Questionnaires prepared by Dr. Carluccio and Dr. Cannella, explaining how they supported her RFC finding.

22

(*Id.* at 35).  Crucially, Plaintiff has not pointed to any relevant medical evidence overlooked by the ALJ in assessing his credibility.  *See Burns*, 312 F.3d at 129 (finding this shortcoming significant).

3.  Whether the ALJ Properly Considered Plaintiff's Work History in Making her Credibility Finding

Plaintiff argues that the ALJ's Credibility finding is deficient because she did not discuss his twenty-three year work history with the NJDOT.  (Pl.'s Br. 16-17).  Plaintiff contends that when a claimant has a long work history, the claimant's testimony concerning his ability to work is entitled to substantial credibility on that basis alone.  (*Id.*).  Plaintiff's contention is inapposite.

A claimant's testimony of subjective pain is not entitled to absolute credibility solely because he has an exemplary work history.  *See Christl v. Astrue*, No. 08-290, 2008 WL 4425817 at *12 (W. D. Pa. Sept. 28, 2008) (citation omitted) ("[A]n ALJ is not required to equate a long work history with credibility."); *see also Polardino v. Colvin*, No. 12-806, 2013 WL 4498981 at *5 (W.D. Pa. Aug. 19, 2013) (noting that "work history is only one of many factors an ALJ may consider in assessing a claimant's subjective complaints.").  At bottom, competent medical evidence must support the ALJ's testimony of subjective pain in order for an ALJ to find it credible.  *See Craig v. Astrue*, No. 11-215J, 2013 WL 322516 at *3 (W. D. Pa. Jan. 28, 2013) ("The testimony of a claimant with a long, productive work history may be given substantial credibility with regard to her work-related limitations but only when those limitations are supported by competent medical evidence.").

Here, as discussed above, the ALJ properly evaluated Plaintiff's credibility based on the entire record, including the available objective medical evidence.  In doing so, she did not entirely ignore Plaintiff's work history.  While she did not explicitly state that Plaintiff had worked for the NJDOT for twenty-three years, she did note that Plaintiff had worked for the

23

NJDOT and that he took a medical retirement. (R. at 23). Ultimately, the ALJ's decision read as a whole illustrates that the ALJ considered Plaintiff's testimony and the objective medical evidence in fashioning her RFC. Thus, the Court concludes that the ALJ's credibility finding is based on substantial evidence. *See generally Gantt*, 205 F. App'x at 67 (internal quotation marks and citations omitted) ("[A]n ALJ has discretion to evaluate the credibility of a claimant and arrive at an independent judgment in light of medical findings and other evidence . . . ."); *see also Woods v. Astrue*, No. 07-252, 2009 WL 1177086 at *7 (D. Del. Apr. 30, 2009) (finding that the ALJ's analysis of the Plaintiff's credibility was sufficient where the ALJ expressly considered the objective medical evidence in the record).

C.    Whether the ALJ's Hypothetical Question to the Vocational Expert was Deficient

Plaintiff argues that the ALJ's hypothetical question to the vocational expert ("VE") at step five was deficient because she did not mention Plaintiff's complaints of pain. (Pl.'s Br. 17). Defendant counters that "the ALJ was not obligated to include in his hypothetical question limitations that he reasonably rejected." (Def.'s Br. 24). The Court agrees with Defendant for the reasons that follow.

An ALJ's hypothetical question to a VE "must reflect all of a claimant's impairments that are supported by the record . . . ." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) (internal citations omitted). Thus, a hypothetical question is sufficient if it reflects "all of a claimant's *credibly established limitations.*" *Rutherford*, 399 F.3d at 554 (3d Cir. 2005) (emphasis in the original and citation omitted).

Here, the ALJ's hypothetical question to the VE virtually mirrors her RFC finding at step four. (*See* R. at 30, 73-74). As discussed in Part III. B. of this Opinion, the ALJ reasonably assessed Plaintiff's credibility at step four, discounting his complaints of pain, when making her

RFC finding.  Consequently, the ALJ was entitled to rely upon the VE's responses as substantial evidence for her step five determination.  *See Izzo v. Comm'r of Soc. Sec.*, 186 F. App'x 280, 287-88 (3d Cir. 2006) (finding that the ALJ's hypothetical question to the VE provided substantial evidence to support the ALJ's step five finding where "the ALJ properly considered [the plaintiff's] non-exertional limitations and her subjective complaints of pain and fatigue in making his RFC finding."); *see also Millan v. Comm'r of Soc. Sec.,* No. 09-1065, 2010 WL 1372421 at *12 (D.N.J. Mar. 31, 2010) (holding that where "the ALJ's findings in his RFC determination were indeed supported by substantial evidence," the hypothetical posed to the VE which incorporated those findings "accurately conveyed … Plaintiff's clearly established limitations.").

## IV.    CONCLUSION

The Court has reviewed the entire record and, for the reasons discussed above, finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court affirms the ALJ's decision.  An appropriate Order accompanies this Opinion.

JOSÉ L. LINARES
U.S. DISTRICT JUDGE

DATED: April 14, 2014

25